UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROCKET MORTGAGE, L.L.C.,

     Plaintiff,

v.

THE GAMERO GROUP, INC.,
d.b.a. FUNDING L.A., and
JENNIFER GAMERO

     Defendants.

Case No. 23-cv-10578

Honorable Robert J. White

---

## ORDER (1) GRANTING DEFENDANTS' MOTION FOR RECONSIDERATION AND (2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This case arises from Plaintiff Rocket Mortgage, L.L.C.'s claims against Defendants the Gamero Group, Inc. (the Group) and Jennifer Gamero, the Group's president. Plaintiff requests specific performance and a declaratory judgment related to the Group's alleged breach of contract and breach of an indemnity agreement, and it asserts one claim against Gamero for fraud.[1] (ECF No. 7) Before the Court is Gamero's motion for reconsideration (ECF No. 46) of an opinion and order granting

---

[1] The Court previously dismissed an identical fraud claim against the Group (ECF No. 42), and the parties do not dispute that this dismissal was proper.

in part and denying in part Defendants' motion to dismiss, which was entered by the district court judge previously assigned to this case (ECF No. 42).  Also before the Court is Plaintiff's motion for summary judgment. (ECF No. 56).  The Parties fully briefed the motions and the Court will decide this matter without oral argument pursuant to Local Rule 7.1(f)(2).

For the following reasons, the Court grants Gamero's motion for reconsideration and therefore dismisses Plaintiff's fraud claim against her.  Next, the Court grants in part and denies in part Plaintiff's motion for summary judgment. Specifically, Plaintiff has established the Group's liability in this case, but it has not proved as a matter of law the amount of damages incurred.

## I.      Background

The Group is a mortgage broker that contracted with Plaintiff to submit loan applications for underwriting. (ECF No. 56-1, PageID.645, 654, 828-29, 834). Gamero was the sole officer of and president for the Group. (ECF No. 56-1, PageID.826).  The Group employed three others, who were involved with loan processing or general paperwork and filing. (ECF No. 56-1, PageID.826-28). Plaintiff eventually discovered that four loan applications that the Group submitted and Plaintiff approved involved misrepresentations of the borrowers' incomes via falsified court records, requiring Plaintiff to repurchase the loans from third-party investors. (ECF No. 56-1, PageID.645-47, 728-39).

According to Plaintiff, these issues resulted from "a deliberate mortgage fraud scheme orchestrated by Gamero." (ECF No. 56, PageID.617; ECF No. 56-1, PageID.646). Defendants, in contrast, do not dispute that the applications contained misrepresentations, but they argue that this alone cannot establish that the Group is strictly liable, or that Gamero is personally liable, in this case. (ECF No. 59, PageID.945-46).

This matter largely turns on interpretation and application of the following contract provisions:

4. REPRESENTATIONS, WARRANTIES AND COVENANTS OF BROKER

*          *          *

4.7 FRAUD. Broker shall not submit any Application or related documents containing false or misrepresented information. Broker shall be responsible for all actions taken in the course of its performance of its obligations under this Agreement, whether performed by Broker, its employees or licensees, or the Applicant, or any other third party retained by or controlled by Broker or Applicant (other than affiliates of Lender) involved in the origination of the mortgage loan. . . .

4.8. NO UNTRUE OR MISLEADING STATEMENTS. No representation, warranty or written statement made by Broker to Lender in this Agreement or in any schedule, written statement or document furnished to Lender in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

*          *          *

### 5. REPRESENTATIONS, WARRANTIES AND COVENANTS AS TO EACH MORTGAGE LOAN

\*          \*          \*

5.2.   COMPLIANCE WITH LENDER POLICIES AND PROCEDURES. . . . All Applications, including all mortgage loan documents and information and documentation submitted in connection with such Applications, have been prepared and/or completed in accordance with applicable law and all information provided by each of Applicant and Broker in such Applications are true and correct in all respects and do not fail to disclose any facts which could be material or which would make such information misleading. . . .

5.3 FRAUD.   Broker shall not submit any Application or related documents containing false or misrepresented information.   Broker shall be responsible for all actions taken in the course of its performance of its obligations under this Agreement, whether performed by Broker, its employees or licensees, or the Applicant, or any other third party retained by or controlled by Broker or Applicant (other than affiliates of Lender ) [sic] involved in the origination of the mortgage loan. . . .

5.4. FACTUAL DISCLOSURE.  All facts relating to any Application and/or related mortgage loan transaction which are known or should be known to Broker which may adversely affect the value of the mortgaged property, the credit, character or capacity of the Applicant, the validity of the mortgage, or any other aspect of the transaction have been disclosed in writing to Lender.

5.5. NO ADVERSE CIRCUMSTANCES.  Broker has no knowledge of any circumstances or conditions with respect to any Application, mortgaged property, Applicant or Applicant's credit standing that reasonably could be expected to cause third party investors to regard the related mortgage loan as an unacceptable investment, cause the mortgage loan to become delinquent or adversely affect the value or marketability of the mortgage loan.

(ECF No. 56-1, PageID.662-64).

The contract also provides a broker 30 days to cure any breach of the agreement, and it requires that the broker repurchase the subject loan(s) if Plaintiff cannot be cured within the period. (ECF No. 56-1, PageID.665). The contract further states:

7. RESPONSIBILITY FOR FRAUD.

Broker shall not submit any Application or related documents containing false or misrepresented information. Broker shall be responsible for all actions taken in the course of its performance of its obligations under this Agreement, whether performed by Broker, its employees or licensees, or the Applicant, or any other third party involved in the origination of the mortgage loan. . . .

8. INDEMNIFICATION.

In addition to the remedies set forth in Section 6 above [for breach], Broker shall indemnify, defend and hold Lender harmless against and in respect of, and shall reimburse Lender for any and all losses, liabilities, claims, damages, costs including without limitation attorneys' fees and costs (including allocated costs of in- house counsel [sic]), and actions suffered or incurred by Lender which arise out of, result from or relate to: (a) the breach by Broker of any covenant, condition, term, obligation, representation or warranty contained (i) in this Agreement, or (ii) in any written statement or certificate furnished by Broker pursuant to this Agreement, including without limitation those arising from any improper origination or processing of mortgage loans; or (b) any material act or omission of Broker or any employee or agent of Broker which adversely affects any mortgage loan submitted to and funded by Lender hereunder. Without limiting the foregoing, Broker's obligations under this Section 8 shall include costs and expenses associated with Lender's efforts to enforce this Agreement. In all actions with third parties in which Lender has the right to be indemnified hereunder, Lender shall have the complete and exclusive right to determine the conduct and defense of such legal proceeding or investigation with such third party including without limitation the right to compromise, settle, defend or continue any such action.

(ECF No. 56-1, PageID.666).

Plaintiff in an amended complaint asserted claims against the Group for breach of contract and breach of the indemnity agreement, and it asserted one claim against both Defendants for fraud.  Plaintiff requested specific performance and a declaratory judgment related to Defendants' alleged misconduct. (ECF No. 7).  The previous district judge later dismissed Plaintiff's fraud claim against the Group. (ECF No. 42).  The previous district judge declined Defendants' request to dismiss the fraud claim against Gamero, however, because the judge (1) could not determine as a matter of law whether Gamero was a party to the agreement at issue; and (2) concluded this to be necessary to bar the fraud claim under *Hart v. Ludwig*, 347 Mich. 559 (1956). (ECF No. 42).

Gamero moves for reconsideration of the previous district judge's opinion and order, arguing that the judge should have also dismissed the fraud claim against her. (ECF No. 46).  Plaintiff moves for summary judgment on the remaining claims against Defendants. (ECF No. 56).

## II.   Legal Standard

District courts are afforded discretion in ruling on a motion for reconsideration. *See Libertarian Nat'l Comm. v. Holiday*, 907 F.3d 941, 948 (6th Cir. 2018).

> Motions for reconsideration of nonfinal orders are disfavored and may be granted in only three circumstances: (1) a mistake that changes the outcome of the prior decision, (2) an intervening change in controlling law that warrants a different outcome, or (3) new facts that warrant a different outcome.

*Yatooma v. Birch Run Twp.*, 624 F. Supp. 3d 820, 822 (E.D. Mich. 2022); *see also* E.D. Mich. L.R. 7.1(h)(2).  Here, Gamero does not raise any new facts or change in law that would warrant a different outcome.  Rather, she argues that the previous district judge made a mistake by not dismissing Plaintiff's fraud claim against her (as the judge did for the fraud claim against the Group). (ECF No. 46).

Next, summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Once the movant has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the summary-judgment motion." *Bernard v. Wal-Mart, Inc.*, No. 22-3735, 2023 U.S. App. LEXIS 7669, at *3 (6th Cir. Mar. 30, 2023).  "In resolving a summary judgment motion, this court must view the evidence in the light most favorable to the non-moving party." *Avantax Wealth Mgmt. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407, 414 (6th Cir. 2024) (quotation marks and citation omitted).  "The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Doe v. City*

*of Memphis*, 928 F.3d 481, 486 (6th Cir. 2019) (quotation marks and citation omitted).

## III.    Analysis

### A.    Reconsideration

Gamero argues that the previous district judge, when declining to dismiss the fraud claim against her, mistakenly relied on a 1938 case that does not control here. (ECF No. 46, PageID.406-08).  Gamero argues further that Plaintiff cannot state a claim for fraud against her where the identical claim against the Group is barred by *Hart*, 347 Mich. 559. (ECF No. 46).  According to Gamero, an individual corporate agent cannot be liable for fraud arising from a contract entered into by the corporate entity, since the conduct at issue is governed exclusively by the contract. (ECF No. 46, PageID.402-06).  In response, Plaintiff argues that *Hart* does not bar the fraud claim against Gamero because she (1) was not a party to the broker agreement and (2) personally participated in the alleged fraud. (ECF No. 51).

"Under Michigan law, in order for an action in tort to arise out of a breach of contract, the act must constitute (1) a breach of duty separate and distinct from the breach of contract, and (2) active negligence or misfeasance." *Spengler v. ADT Sec. Servs.*, 505 F.3d 456, 457-58 (6th Cir. 2007); *see also Ulrich v. Fed. Land Bank of St. Paul*, 192 Mich. App. 194, 199 (Mich. Ct. App. 1991) ("if a relation exists that

would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise it will not").

In *Hart*, the Michigan Supreme Court held that where the only violation was that of a broken promise to perform a contract, and there existed no independent duty outside the contract, "liability, if any, must rest solely upon a breach of the contract." *Hart*, 347 Mich. at 560-65 (cleaned up). "If it were otherwise, contractual obligations and all their limitations and scope of remedies would be overridden. For instance, contracting parties would be held liable for 'all consequential damages arising from [a breach].'" *Miller v. Joaquin*, 431 F. Supp. 3d 906, 914 (E.D. Mich. 2019) (alteration in original), quoting *Hart*, 347 Mich. at 563. "The societal obligations of tort would then replace the private terms of a tailored agreement. Such a result would undermine the very purpose of contracts, predictability and managed expectations." *Id.*, citing *Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 701, 705 (6th Cir. 2002).

In denying Defendants' request to dismiss the fraud claim against Gamero, the previous district judge first cited *Emmet v. Franco*, No. 16-11211, 2016 U.S. Dist. LEXIS 109726 (E.D. Mich. Aug. 18, 2016), to conclude that *Hart* did not bar a fraud claim against Gamero *if* she was not a party to the broker agreement at issue. (ECF No. 42, PageID.357). "If, however, factual development shows that [Gamero] is a party to the agreement, the [*Hart*] doctrine will come into play." (ECF No. 42,

PageID.357).  Next, the previous district judge cited *Bush v. Hayes*, 286 Mich. 546 (1938), for the proposition that a corporate agent may be liable for fraud even if the corporate entity is not. (ECF No. 42, PageID.357).  The previous district judge relied on *Bush* to conclude that the *Hart* doctrine's applicability to bar Plaintiff's fraud claim against the Group "has no bearing on [Plaintiff]'s ability to allege fraud against Ms. Gamero." (ECF No. 42, PageID.357).

As an initial matter, in *Bush*, which was decided well before *Hart*, the Michigan Supreme Court concluded that corporate agents could be liable for conversion even if only acting on behalf of the corporate entity. *Bush*, 286 Mich. at 549-50 ("The trial judge erred in instructing the jury that to hold the defendants liable there must be evidence showing that they converted the beans to their own use.  If there has been a conversion in which they participated[,] they are liable.  It is of no consequence whether they acted for the corporation or acted for themselves if they were active participants in converting beans which belonged to plaintiff.  They are liable for the torts which they commit, be it for themselves or for another.").  And Michigan law post-*Hart* still provides that "corporate officials may be held personally liable for their individual tortious acts done in the course of business, regardless of whether they were acting for their personal benefit or the corporation's benefit." *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 485 Mich. 1, 17 (Mich. 2010).

However, contrary to the previous district judge's prior opinion, *Bush* does not support that a corporate agent may be liable for fraud even if the corporate entity is not, at least when an identical claim against the entity is barred by *Hart*. Although *Bush* found the defendant corporate agent could be liable for conversion even after all claims against the corporation were dismissed, 286 Mich. at 548, 552-53, it substantively addressed only the bounds of a corporate agent's individual liability, and it involved no issue of contract like in this and other *Hart*-related cases. Nor did the *Hart* doctrine even exist at this time. Most importantly, the Sixth Circuit in an analogous case to that here has already rejected essentially the same arguments Plaintiff now makes to claim an exemption from *Hart*.

Specifically, in *DBI Invs., LLC v. Blavin*, 617 F. App'x 374 (6th Cir. 2015) (unpublished), the Sixth Circuit explicitly rejected the plaintiff's argument that a fraud claim was not barred by a contract because the defendant was not an individual party to the contract. *Id.* at 383. The *DBI* Court acknowledged that the plaintiff was correct that a corporate official could be personally liable for tortious acts done in the course of business, but it concluded that the plaintiff failed to establish "that this principle trumps the economic loss doctrine.[2]" *Id.* The Court then stated:

_____

[2] Although *DBI* purported to rely on the economic loss doctrine, it effectively applied the rule of *Hart* to bar a claim of fraud premised on misrepresentations involving a partnership agreement. *See Covenant Steel Warehouse, Inc. v. Arauco N. Am., Inc.*, No. 21-10609, 2021 U.S. Dist. LEXIS 145711, at *8 n. 4 (E.D. Mich Aug. 4, 2021).

> Defendant's [allegedly fraudulent] representations about dissolution procedures and the operation of the Performance Fee *were made in the course of arranging and carrying out a partnership contract* between Plaintiff and entities that he controlled. In these circumstances, Plaintiff cannot avoid the economic loss doctrine merely by suing Defendant in his personal capacity.

*Id.* (emphasis added).

These same circumstances exist here. To the extent Gamero committed fraud, the misrepresentations in the loan applications were all made in the course of carrying out the broker agreement between Plaintiff and the Group. Indeed, the agreement specifically establishes the Group's duty to submit accurate information, and the Group remains responsible under the contract's terms for any actions by employees or any other third party retained or controlled by the Group if related to compiling and submitting applications. Given these facts, the Court concludes that this matter presents an instance where, without applying *Hart*, "contractual obligations and all their limitations and scope of remedies would be overridden." *Miller*, 431 F. Supp. 3d at 914. Maintaining a fraud claim against Gamero related to the very same conduct prohibited under the broker agreement would impermissibly

---

And courts have recognized that "[g]iven the similarity between the two doctrines, courts sometimes misidentify the rule of *Hart* as the economic loss doctrine. *Id.* Next, although the economic loss doctrine is specific to contracts for the sale of goods, it entails essentially the same analysis as under *Hart*. See City of Birmingham Employees' Ret. Sys. v. Comerica, Inc., No. 09-13201, 2012 U.S. Dist. LEXIS 198964, at *8-9 (E.D. Mich. Aug. 28, 2012). For these reasons, the reasoning of *DBI* applies equally to this case under *Hart*.

allow "[t]he societal obligations of tort [to] replace the private terms of a tailored agreement[] . . . [and] undermine the very purpose of contracts, predictability and managed expectations." *Id.*

As a final matter, the Court will address previous district judge's reliance on *Emmet*, 2016 U.S. Dist. LEXIS 109726, to conclude that *Hart* does not bar claims against an individual who was not a party to the contract at issue. In *Emmet*, the district court concluded that *Hart* barred fraud and other non-contractual claims against two defendants because a contract governed their relationship with the plaintiff. *Emmet*, 2016 U.S. Dist. LEXIS 109726 *at 18-19. But the court determined that similar claims against the remaining defendants could move forward "because the remaining Defendants are not parties to the subject contracts." *Id.* at *19. However, this conclusion lacks any supporting authority or analysis to guide the Court in this case. And *Emmett*'s result is contrary to the reasoning and decision in *DBI*, which is the more authoritative case.

Gamero's motion for reconsideration is therefore granted, and the Court dismisses Plaintiff's fraud claim against her.

## B.   Summary Judgment

Plaintiff argues that its claims against both Defendants should be decided in its favor as a matter of law. As discussed, the fraud claim against Gamero must be

dismissed. But Plaintiff is entitled to summary judgment, at least concerning liability, for its remaining claims against the Group.

### 1. The Group's Alleged Breach of Contract and Breach of Indemnity Agreement

According to Plaintiff, the Group is liable for breaching the broker agreement as a matter of law because the Group submitted multiple loan applications with misrepresented and false information. (ECF No. 56, PageID.632-36).

Defendants counter that the Group cannot be strictly liable under the contractual language at issue for alleged fraud committed by borrowers. (ECF No. 59, PageID.948-51). Defendants, relying on dictionary definitions, first argue that the contract terms "must be read" to require that submitted information be *knowingly* false or misrepresented, such that the Group had to intentionally deceive Plaintiff for a breach to occur. (ECF No. 59, PageID.949; *see also* ECF No. 59, PageID.951-52).

Next, Defendants argue that, at the very least, the contract terms are ambiguous to the extent that "false" and "misrepresent" have multiple possible definitions. (ECF No. 59, PageID.949-50). Defendants claim, therefore, that the ambiguity must either be interpreted by a jury or, as a last resort, interpreted against Plaintiff. (ECF No. 59, PageID.950). Defendants also assert that it would be an absurd and unreasonable interpretation of the contract if the Group was required to "second-guess its borrowers' production of facially-valid court records and instead conduct its own investigation." (ECF No. 59, PageID.950-51).

The broker agreement here is governed by Michigan law. (ECF No. 56-1, PageID.670).  "Under Michigan law, a valid breach-of-contract claim must establish three elements: (1) the existence of a contract; (2) a breach of that contract; and (3) damages suffered by the nonbreaching party as a result of the breach." *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018).

Furthermore, under Michigan law, "[a]n indemnity contract creates a direct, primary liability between the indemnitor and the indemnitee that is original and independent of any other obligation."  *Miller-Davis Co. v. Ahrens Constr. Inc.*, 495 Mich. 161, 173 (Mich. 2014).  It is undisputed that the broker agreement here includes an indemnity provision requiring indemnification and reimbursement by the Group for any breach of the agreement, and that Defendants have made no such efforts to date.  Therefore, if Plaintiff succeeds (or fails) on its breach-of-contract claim, it will necessarily succeed (or fail) on its related claim for breach of the indemnity agreement.

In Michigan, "the primary goal of contract interpretation is to honor the intent of the parties." *In re Auto. Parts Antitrust Litig.*, 997 F.3d 677, 681 (6th Cir. 2021) (cleaned up).  "To achieve that goal, courts must read the contract as a whole." *Id.* "If the contractual language is clear and unambiguous, the terms are to be taken and understood in their plain, ordinary, and popular sense." *Id.* (cleaned up). "[U]nambiguous contract terms 'must be *enforced as written*.'" *Superior Comm'ns*

15

*v. City of Riverview*, 881 F.3d 432, 438 (6th Cir. 2018) (citation omitted; emphasis in original).

Only when contract terms "may reasonably be understood in different ways" does an ambiguity arise, and only in cases of ambiguity is extrinsic evidence permitted to aid in interpreting the contract—which then becomes a question for a jury. *Id.*; *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 426-27 (6th Cir. 2016). But courts "will not create ambiguity where the terms of the contract are clear." *Superior Comm'ns*, 881 F.3d at 438; *see also Stryker Corp.*, 842 F.3d at 427 ("courts may not admit extrinsic evidence to 'create ambiguity where the terms of the contract are clear.'"). And courts "must give effect to every word, phrase, and clause, and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Lossia*, 895 F.3d at 428-29 (cleaned up).

As an initial matter, regarding Defendants' proposed interpretation of the phrase "false or misrepresented information" in the broker agreement, it is appropriate to consult dictionary definitions as an aid in contract interpretation when a contract does not define specific words or phrases. *Auto Owners Ins. Co. v. Olympia Entm't, Inc.*, 310 Mich. App. 132, 147-48 (Mich. App. 2015). But "contractual terms must be construed in context and read in light of the contract as a whole." *Id.* at 148 (citations omitted); *see also Feyz v Mercy Mem'l Hosp.*, 475 Mich. 663, 685 n. 62 (Mich. 2006) ("[B]ecause a word can have many different

16

meanings depending on the context in which it is used, and because dictionaries frequently contain multiple definitions of a given word, in light of this fact, it is important to determine the most pertinent definition of a word in light of its context.").

Defendants point the Court to Merriam-Webster's Online Dictionary, which defines "false" as "not genuine"; "intentionally untrue"; "adjusted or made so as to deceive"; "intended or tending to mislead"; "not true"; "not faithful or loyal"; "lacking naturalness or sincerity"; "not essential or permanent"; "fitting over a main part to strengthen it, to protect it, or to disguise its appearance"; "inaccurate in pitch"; "based on mistaken ideas"; "inconsistent with the facts"; or "threateningly sudden or deceptive." *False*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/false (accessed April 29, 2025). And "misrepresent" is defined as "to give a false or misleading representation of usually with an intent to deceive or be unfair," or "to serve badly or improperly as a representative of." *Misrepresent*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/misrpresent (accessed April 29, 2025).

Defendants emphasize the "intentionally-untrue" and "with-an-intent-to-deceive" language from these definitions to argue that any breach in this case required the Group's knowing submission of inaccurate information. But with respect to misrepresent, the full definition shows only that this *usually* entails an

17

intent to deceive.  More importantly, interpreting the phrase "false or misrepresented information" in the context of the entire agreement, it is plain and clear that a broker is liable even for inaccuracies of which it was ignorant. *See Vushaj v. Farm Bureau Gen. Ins. Co.*, 284 Mich. App. 513, 516 (Mich. App. 2009) ("When read in the context of the contract, the terms 'vacant' and 'unoccupied' are not ambiguous because a fair reading of the entire contract leads only to the conclusion that coverage is not available in the present case.").

Specifically, the provisions concerning fraud hold the broker responsible not only for its own inaccuracies, but also for an applicant's or other third-party actions taken in the course of the Group compiling and submitting loan applications.  If the contract terms did not provide for strict liability, these provisions related to inaccuracies of third parties would be rendered nugatory.  And a separate provision in the agreement further prohibits any submission by the broker "containin[g] any untrue statement of a material fact," with no limitation concerning the broker's knowledge of or involvement with such untruths. (ECF No. 56-1, PageID.662-66).

Therefore, reading the contract as a whole and placing the disputed terms in context, the agreement clearly provides for strict liability in the event the broker submits information in a loan application that is untrue.  Any reading of the contract results in the conclusion that the purpose of the provisions in question are to protect Plaintiff and place the risk of inaccuracy on the Group, who is in a better position—

as the party dealing with applicants and compiling records for loan applications—to prevent errors.

The Court therefore disagrees that it would be an absurd and unreasonable to allow strict liability under the broker agreement. Having interpreted the contractual language at issue, it is undisputed that the Group submitted numerous loan applications that included untruthful information regarding borrowers' incomes, thereby breaching the broker agreement. Accordingly, Plaintiff has established as a matter of law the Group's liability on its claims for breach of the broker agreement and breach of the included indemnity agreement.

### 2. Damages

Next, Defendants argue that Plaintiff cannot establish damages as a matter of law. (ECF No. 59, PageID.952-56). In particular, Defendants assert that (1) Plaintiff's evidence on damages is inadmissible hearsay; (2) the evidence nevertheless does not show that Plaintiff would not have made the subject loans absent the misrepresentations—*i.e.*, it does not show the materiality of the misrepresentations; and (3) Plaintiff's alleged repurchase of the loans for a loss was voluntary and not the result of any alleged breach. (ECF No. 59, PageID.952-56).

Plaintiff seeks $448,566.66 in damages, plus costs and fees, related to the alleged forgone revenue and added expense of repurchasing the fraudulent loans. (ECF No. 56, PageID.631, 639; ECF No. 56-1, PageID.647-51). In support, Plaintiff

attaches four letters from Fannie May and Freddie Mac (the third-party loan purchasers) corresponding to each fraudulent loan application and stating that each loan "must be repurchased" because of falsely represented income, with the latest repurchase required by January 20, 2023. (ECF No. 56-1, PageID.728-39). Plaintiffs also provide the signed declaration, made under penalty of perjury, of Renee Samet, a Vice President of "Crew Operations Rocket Pro TPO Underwriting" with Plaintiff. (ECF No. 56-1, PageID.644, 652).

According to Samet, Plaintiff relied on the fraudulent submissions to approve and originate the four loans at issue, and to subsequently sell them to third-party investors (ECF No. 56-1, PageID.645, 647). Samet declares that Plaintiff ultimately had to repurchase these loans "[d]ue to the [applications'] misrepresentations," and that it later resold the loans—"at a discounted price due to the [loans'] defects"—to other investors as a way to mitigate damages. (ECF No. 56-1, PageID.647-49). Next, Samet details the damages Plaintiff allegedly incurred with respect to each loan after its repurchase and resale, as calculated by: (1) the amount paid to repurchase each loan from the original investor, (2) plus any fees related to the repurchase, (3) plus any compensation Plaintiff paid the broker at origination, (4) minus payments made on the loan after repurchase and before resale, and (5) minus proceeds from resale. (ECF No. 56-1, PageID.649-51).

The broker agreement here provides that in the event of breach,

> Lender may demand and Broker shall be required to repurchase in all
> material respects said loan from Lender or the investor to whom Lender
> sold the loan for the "Repurchase Price."  The Repurchase Price shall
> be an amount equal to the sum of (i) the current unpaid principal
> balance of the loan at the time of repurchase . . . , (ii) accrued but unpaid
> interest on such principal balance . . . from the paid-to date of the loan
> through and including the last day of the month in which the
> Repurchase Price is paid, (iii) all costs and expenses, including without
> limitation, reasonable attorneys' fees and expenses, incurred by Lender
> as a result of Broker's breach of this Agreement or enforcing the terms
> of this Agreement or Broker's obligation to repurchase the loan, (iv)
> any premium paid by Lender in excess of the principal balance of the
> loan at the time of purchase if Lender has not sold the loan at the time
> of Broker's repurchase or if Lender has sold the loan and it is required
> to reimburse the purchaser, the premium that the purchaser paid to
> Lender, (v) any unreimbursed advances made by Lender, including
> without limitation taxes or insurance or payments authorized by the
> Note or the mortgage or applicable law to protect Lender's interest in
> the loan or related property and (vi) any other fees, costs or amounts
> relating thereto.  The Repurchase Price shall be reduced by (i) any
> proceeds of mortgage insurance collected by Lender with respect to the
> loan that have not been applied to the unpaid principal balance . . . .

(ECF No. 56-1, PageID.665).   And the separate indemnification provision

"addition[ally]" requires the Group to "reimburse Lender for any and all losses,

liabilities, claims, damages, costs including without limitation attorneys' fees and

costs (including allocated costs of in- house counsel) [sic], and actions suffered or

incurred by Lender which arise out of, result from or relate to" a breach of contract.

(ECF No. 56-1, PageID.666).

     Samet declares that the above block-quoted language required that the Group

repurchase the fraudulent loans from Plaintiff after Plaintiff's own repurchase from

the initial third-party investors, but the Group failed to do so. (ECF No. 56-1,

PageID.647-48, 651-52).   According to Samet, the Group also failed to cure its breach or indemnify Plaintiff as required by the contract. (ECF No. 56-1, PageID.651-52).

In Michigan, "[t]he party asserting a breach of contract has the burden of proving its damages with reasonable certainty[] and may recover only those damages that are the direct, natural, and proximate result of the breach. *Van Buren Charter Twp. v. Visteon Corp.*, 319 Mich. App. 538, 550 (Mich. App. 2017).  "The measure of damages in relation to a breach of contract is the pecuniary value of the benefits the aggrieved party would have received if the contract had not been breached." *Doe v. Henry Ford Health Sys.*, 308 Mich. App. 592, 601 (Mich. App. 2014).  "Damages must not be conjectural or speculative in their nature, or dependent upon the chances of business or other contingencies." *Van Buren Charter Twp. v. Visteon Corp.*, 319 Mich. App. at 551 (cleaned up).

"Although breach-of-contract damages need not be precisely established, uncertainty as to the fact of the amount of damage caused by the breach of contract is fatal." *Id.* (cleaned up).  However, the caselaw of this circuit provides that the prohibition on speculative or uncertain damages "'serves to preclude recovery, however, only where the fact of damage is uncertain, *i.e.*, where the damage claimed is not the certain result of the wrong, not where the amount of damage alone is uncertain.'" *GSL Holdings, LLC v. Charter Twp. of Lyon*, No. 21-11664, 2023 U.S.

22

Dist. LEXIS 132171, at *21 (E.D. Mich. Jul. 31, 2023) (emphasis added; quoting *Grantham & Mann v. Am. Safety Prods.*, 831 F.2d 596, 601-02 (6th Cir. 1987); *see also Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 837 (6th Cir. 2007) ("Damages cannot be speculative, but this only means that the *fact* of damages, not their amount, cannot be uncertain.") (emphasis in original).

As an initial matter, the Court concludes that Plaintiff has established as a matter of law that it generally suffered damages as a result of the Group's breach of contract. The business records attached to Plaintiff's motion, which are admissible under Fed. R. Evid. 803(6), sufficiently show that Plaintiff was required to repurchase the loans at issue because of the misrepresentations of the borrowers' incomes—*i.e.*, because of the Group's breach. (*See* ECF No. 56-1, PageID.628-39). In the Court's view, this suffices to establish the element of damages.

But Plaintiff fails to provide admissible evidence at this stage of the proceedings to substantiate any reasonably certain *amount* of damage incurred. Notably, Plaintiff's reply brief—concerning Defendants' hearsay argument—counters that its business records are admissible to prove both liability and damages, and that Samet's "averments comport with Fed. R. Ev. [sic] 803(6)(D)." (ECF No. 60, PageID.978-79). The Court agrees that Samet is qualified under Fed. R. Evid. 803(6)(D) to establish the conditions necessary for admission of Plaintiff's business records. And Samet's declaration properly satisfies all conditions of Fed. R. Evid.

803(6) as necessary to admit Plaintiff's business records in this case.  Accordingly, the business records themselves, as well as Samet's statements that clearly derive facts from the attached records, are admissible here.

Nevertheless, Samet's statements regarding the amount of damages incurred are not supported by any of the records Plaintiff provides.  Specifically, while the business records support that Plaintiff had to repurchase the loans at issue because of the misrepresentations of the borrowers' incomes, Plaintiff provides no records to corroborate Samet's accounting of damages *resulting from* said repurchases—such as a receipt or other record of the amounts for each loan that (1) Plaintiff initially paid the Group in commission, (2) Plaintiff had to pay for repurchase, and (3) Plaintiff recouped via resale.

The Court must therefore determine whether Samet's accounting is sufficiently based on her personal knowledge and admissible, or else is based on inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006) ("[H]earsay . . . may not be considered on a motion for summary judgment."); *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 516 (6th Cir. 2022)

(affidavit excluded because it "contain[ed] extensive hearsay and testimony about which [the individual] had no personal knowledge").

According to Samet, the facts of her declaration are based on her "personal knowledge of the matters set forth," as derived "from both first-hand knowledge, knowledge acquired based upon a review of Rocket Mortgage's business records, and, if necessary, *appropriate inquiry of persons having knowledge of such facts*." (ECF No. 56-1, PageID.644 (emphasis added)).  Critically, to the extent Samet's accounting is based on information gained from others, it would be inadmissible hearsay and lack a basis in her own personal knowledge. *See Blount*, 55 F.4th 504 at 516; Fed. R. Evid. 801(c) (Hearsay is an out-of-court statement that is "offer[ed] in evidence to prove the truth of the matter asserted in the statement.").  And the Court is unable to determine whether Samet's accounting of damages are facts based on her own personal knowledge or else based on an inquiry to other persons (as already discussed, the accounting is not derived from or supported by any of Plaintiff's attached business records).

Ultimately, because it is unclear whether the specific declarations related to the accounting of damages are based on Samet's personal knowledge, they must be excluded from consideration at this stage of the proceedings.  *See Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) ([W]hen affidavits based on knowledge and belief are submitted to support or oppose a motion for summary judgment, the

district court has discretion to determine whether it can differentiate between knowledge and belief for each averment in the affidavit. . . . If the court cannot differentiate between the two, then . . . the court must strike the affidavit in its entirety).  The Court acknowledges, however, that an individual or individuals testifying at trial to the same accounting, so long as there is a sufficient basis for such testimony, would establish the amount of damages Plaintiff seeks.

In sum, Plaintiff has established the Group's liability in this case.  But because the amount of damages remains unclear, this question alone is reserved for trial. *See* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."); *Doe v. Baum*, No. 16-13174, 2019 U.S. Dist. LEXIS 169625, at *34 (E.D. Mich. Sep. 30, 2019) ("The Court will enter judgment as a matter of law in Doe's favor on all elements of the due process claim in Count I save one, reserving for trial the question of whether the plaintiff was prejudiced by the established violation of his rights.").

* * *

For the reasons given, the Court ORDERS that Gamero's motion for reconsideration (ECF No. 46) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's fraud claim against Gamero is DISMISSED.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment (ECF No. 56) is GRANTED IN PART AND DENIED IN PART.  The Court determines that the Group is liable as a matter of law for breaching the broker contract and included indemnity agreement, but Plaintiff's request for damages at this stage of proceedings is DENIED.


Dated: May 9, 2025                              s/Robert J. White_____
                                                Robert J. White
                                                United States District Judge